2016 WL 3209498
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

DELPHINE HENRY, Plaintiff-Appellant,
v.
ABBOTT LABORATORIES, Defendant-Appellee.

No. 15-4165
|
Jun 10, 2016

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

BEFORE: KETHLEDGE and WHITE, Circuit Judges; and COHN, District Judge.[*]

**Opinion**

HELENE N. WHITE, Circuit Judge.

 *1  Plaintiff Delphine Henry appeals the grant of summary judgment in favor of Abbott Laboratories ("Abbott") on her claims of race discrimination, retaliation, and constructive discharge. We conclude that Henry presented a genuine dispute of material fact regarding race discrimination and retaliation; however, the district court correctly determined that Henry was not constructively discharged. Accordingly, we **AFFIRM in part** and **REVERSE and REMAND in part**.

**I.**

From 1999, until September 29, 2011, Henry was employed as a level I consumer-relations representative ("CRI") handling consumer and healthcare-professional inquiries and consumer complaints at Abbott. As a CRI, Henry handled simple consumer complaints and responded to consumer inquiries through letters. She was also required to maintain a working knowledge of Abbott Nutrition marketing programs.

Henry reported to manager Carol Marvin, who, along with managers Julie Matovich and Diane Williams, reported to the director of consumer relations, Laurie Boogaard. Each manager led a team of employees comprised of CRIs, level II consumer-relations representatives ("CRII"), quality coordinators, and senior representatives, who performed the same jobs and followed the same policies and procedures as the corresponding members of other teams. Boogaard judged each manager by the same criteria and discussed performance evaluations of individual team members with the managers, sometimes recommending changes.

Abbott monitored the CRIs' performance in several ways. Managers or senior representatives listened to three to five randomly selected calls handled by each CRI on their team every month, and scored the CRIs' performance during those calls using the following system: EE (Exceeding Expectations) = 100%; AE (Achieving Expectations) = 94-99.99%; PA (Partially Achieving Expectations) = 89-93.9%; and NA (Not Achieving Expectations) = 88.9% or less. Each month, CRIs were also graded by the accuracy of the information they logged in the database of complaints and the letter responses they drafted to consumer inquiries.

CRIs were given annual performance reviews evaluating goals, core job responsibilities, and competencies using the same four ratings: EE, AE, PA, and NA. Managers wrote the evaluations, which were then reviewed by Boogaard, who sometimes suggested changes.

To be promoted to a CRII, a CRI generally was required to have one year of experience as a fully functioning CRI and to complete all pre-assessment procedures and CRII training. A CRI is considered to be fully functioning if she receives a rating of AE on her annual performance evaluation. Matovich testified that, generally speaking, it took between one and two years for a CRI to move into a CRII position. The promotion process consisted of managers identifying CRI candidates by the first day of February and August each year, after which senior representatives and coordinators were asked to complete anonymous surveys regarding those candidates' readiness for promotion.[1] A CRI must attain a score around 80 or 85% on the pre-assessment surveys in order to be

eligible to train for the CRII position. Surveys regarding Henry's CRII-readiness completed in 2004 resulted in a total average score of 67%. Marvin testified that survey results of Henry's CRII-readiness completed in 2006 were "unfavorable." (Marvin Dep., PID 1474.)

**\*2** In March 2009, Marvin gave Henry an overall score of AE in her 2008 performance evaluation. Most of her eighteen subcategory ratings were AE, but Henry received EEs in accuracy of complaint documentation and phone efficiency, and one PA for written correspondence in response to inquiry letters. However, Marvin did not identify Henry as a candidate for promotion to CRII in 2009 despite her AE rating, and did not distribute CRII-readiness surveys; thus, Henry was not eligible for CRII training or promotion.

In February 2010, Henry received an overall AE in her 2009 performance evaluation. Again, most of her subcategory ratings were AE, but Henry received EEs in percent of calls logged with product detail and phone efficiency, and a PA in innovation. The next month, Henry inquired of Marvin and Boogaard about a promotion to CRII; Boogaard responded that length of time in the department was not an indicator of which role a person is best fit to handle and that Marvin would continue to speak with Henry about her development.

After other CRIs were promoted, Henry lodged a complaint with employee relations on April 27, 2010, about not being permitted to train for a CRII position despite her length of time as a CRI and positive reviews. Henry followed up with employee relations on May 2, identifying eight employees who were promoted within a year or two of employment. On May 4, Henry filed a charge of employment discrimination with the Ohio Civil Rights Commission ("OCRC"), alleging race discrimination in the failure to promote her.

Employee relations notes indicate Abbott received a "legal letter" on June 8 alleging "[f]ailure to promote based on race." (PID 2357.) On June 8 and June 10, employee relations representative Deborah Boskovic initiated a discussion with Marvin about why Henry was not offered CRII training. Marvin explained that most CRIs had degrees in nutrition, unlike Henry; Henry had problems with computer systems and speaking to customers regarding complaints; Henry had not demonstrated that she has the expertise necessary for a CRII position, as she often needed a senior representative to assist her; Henry had poor grammar; and, ultimately, despite having a great attitude, Henry had hit her ceiling as a CRI. Marvin followed up with an email to employee relations on June 10, identifying "[s]kills needed for advancement to [CRII] that have yet not been demonstrated." (PID 2360.) Marvin wrote that Henry needed to listen carefully to customers and probe appropriately to confirm their needs; perform independent research; mentor new CRIs; improve written communication skills; gain proficiency in computer systems; and, most importantly, be able to take any call or question without depending on her senior representative.

At some point, Marvin distributed pre-assessment surveys to senior representatives to evaluate Henry's readiness for promotion.[2] On June 25, Marvin met with Henry to discuss the outcome of the surveys and explained that she had received negative results. According to Marvin, Henry did not accept the feedback and wanted to know who had conducted the surveys. After the meeting, Marvin assigned a quality coordinator to sit with Henry. Henry's call-quality scores for June (88.4%), July (93.5%), and August (93.4%) were significantly lower than Henry had received in the months prior, and fell below a rating of AE. Henry testified that she was also subject to more "sit-withs" than normal in the latter half of June. (Henry Dep., PID 2324.) A sit-with is where a senior representative or quality coordinator sits with the CRI while the CRI answers consumer calls, providing feedback after each call. Henry then sent a memo to employee relations on June 28, complaining about the surveys and alleging that Marvin was harassing her.

**\*3** Henry does not dispute that she had performance problems in 2010. She struggled with a new software program called SalesForce that was implemented in June 2010 and had to receive training on it on three separate occasions, although she asserts that other employees had similar issues with SalesForce because there were defects in the system. She also had trouble on certain calls with consumers, which were documented in her performance evaluation. The most serious issue occurred in November 2010, when Henry mistakenly gave a consumer the department password to an internal Abbott database containing confidential customer information, including customer names and addresses. Henry was suspended for two weeks as a result of this incident and received a written warning. When she returned from her suspension,

Marvin, Boogaard, and another manager decided Henry should work on the training line to take calls with fewer complexities.

In December 2010, Marvin contacted Boskovic to discuss placing Henry on a performance improvement plan. Marvin made this request after speaking with Boogaard and HR. Boskovic's notes also reflect that several managers were advocating for rating Henry as NA for 2010, but that Boskovic thought such a rating would appear retaliatory. Henry was instead given an overall performance rating of PA for 2010. She received a PA or NA in all subcategories except innovation, complaint documentation accuracy, percent of calls logged with product detail, and knowledge of rebates and marketing programs. She received a PA in call-quality scores even though Marvin testified that her annual average would have ranked as AE. Marvin cited declining performance in the latter months of 2010 to explain the discrepancy. Henry remained on the training line throughout 2011.

On April 28, 2011, the OCRC issued a decision in Henry's case finding that it was probable that Abbott had discriminated against Henry, relying on the similarity of Henry's positive performance reviews to performance reviews of Caucasian CRIs who had been promoted to CRII, some of whom had less experience than Henry. The next day, Boskovic spoke with a local HR representative, Kevin Mason, who informed Boskovic that management "wants to take the next step but [is] feeling paralyzed to do anything formal." (Boskovic Dep., PID 2352-53; Employee Relations Notes, PID 2370.) Boskovic worked with Marvin to create a letter of expectations, which was given to Henry on June 3, 2011. The letter informed Henry that she would have 60 days to improve her performance and return to normal CRI duties, and that her progress would be measured by her call-quality scores and proficiency in systems such as SalesForce. Henry testified that she understood the letter was disciplinary and was meant to push her out the door.

On June 8, 2011, Henry's doctor recommended that she take a medical leave of absence due to stress and anxiety. Shortly after Henry returned to work in August, she informed Abbott that she was retiring the following month. Henry believed that she would be fired, although no one from Abbott told her that she would be fired or that she was not meeting the expectations outlined in the letter of expectations.

Henry filed suit in September 2012. Abbott moved for summary judgment on all claims, which the district court granted. The district court held that Henry's race-discrimination claims failed because, for 2009, she could not show pretext; and for 2010, she did not establish that a similarly situated individual who was not African-American received a promotion, nor did she show pretext. The district court also held that Henry did not show constructive discharge because Abbott did not create intolerable working conditions, and that her retaliation claim failed because she did not otherwise establish a materially adverse action. Henry now appeals the grant of summary judgment on all claims.

## II.

This court reviews de novo a district court's order granting summary judgment. *Rudisill v. Ford Motor Co.*, 709 F.3d 595, 600 (6th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether the district court's grant of summary judgment was proper, the court "must view all evidence in the light most favorable to the nonmoving party." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). [3]

**A. Race Discrimination**

*\*4* Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a). Similarly, Ohio Revised Code § 4122.02(A) prohibits an employer from discriminating against an employee because of race. Claims under Ohio Rev. Code § 4112 are analyzed under the same framework as Title VII claims. *Blanton v. Cuyahoga Cty. Bd. of Elections*, 779 N.E.2d 788, 792-93 (Ohio Ct. App. 2002). Because Henry relies on circumstantial evidence of discrimination, we apply the *McDonnell Douglas* burden-shifting framework. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007). In failure-to-promote cases, to prove a prima facie case under the *McDonnell Douglas* framework, a plaintiff must show that "(1) she is a member of a

protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005).

If Henry establishes a prima facie case, the burden of production shifts to Abbott to articulate a legitimate, non-discriminatory reason for its actions. *Id.* at 238. If Abbott meets its burden, the burden shifts back to Henry to demonstrate that Abbott's proffered explanation was a pretext for discrimination. *Id.* Henry can demonstrate pretext by showing that "the proffered reason (1) has no basis in fact, (2) did not actually motivate [Abbott's] challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

### 1. Prima Facie Case

Abbott argues that Henry failed to establish a prima facie case of race discrimination for failure to promote in 2009 and 2010 because Henry was not qualified for promotion in either year, and because Henry failed to identify a similarly situated individual for 2010. (Appellee Br. 21-27.) Abbott does not dispute the district court's finding that Henry identified a similarly situated individual for 2009.

In support of its argument that Henry was not qualified for promotion in either year, Abbott points out that Henry never received a passing score on the readiness surveys, including in 2010, which is a prerequisite to being promoted. (Appellee Br. 27.) In *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (en banc), this court explained that, "[a]t the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." "Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* at 576. Here, the CRII job description provided that (1) an undergraduate degree in dietetics, business, communications, or biology is preferred, and nutritional knowledge is a plus; (2) the employee should have one year of experience as a fully functioning CRI, which means that the employee received an overall AE on her most recent annual performance evaluation; and (3) the employee must successfully complete all pre-assessment procedures (including surveys and testing) and CRII training. Henry undisputedly meets criteria (1) and (2).

As to criterion (3), Abbott argues that Henry's 2010 pre-assessment survey scores, which Marvin testified were unfavorable, rendered her unqualified even in 2009. In 2009, however, Henry was not identified as a candidate for promotion and was never subject to the pre-assessment surveys. Thus, she was not disqualified for promotion on account of the pre-assessment surveys at that time. Under these circumstances, a reasonable jury could find that Henry was qualified for promotion in 2009 based on her 2008 performance.

**\*5** In 2010, however, Marvin apparently did circulate pre-assessment surveys for Henry after Henry requested a promotion, and she informed Henry that her scores were unfavorable in June of that year. Abbott's argument that Henry was unqualified is thus stronger for 2010. Nonetheless, there were apparently some irregularities with the pre-assessment surveys. There is evidence that these surveys were circulated outside the normal timeframe—causing the senior representatives to question them—and that not all of the surveys were completed. Henry also disputes the accuracy of the surveys. Given these irregularities and the subjective and anonymous nature of the surveys (which are not in the record), a reasonable jury could find that Henry was qualified for CRII training upon receiving her AE performance evaluation for 2009.

Abbott also argues, and the district court found, that Henry failed to present a prima facie case for 2010 because she failed to demonstrate that an individual with similar qualifications who is not a member of the protected class received a promotion from CRI to CRII at the same time Henry was denied a promotion. The district court reasoned that Rachel Wallis—the purported comparator —was not similarly situated to Henry because she did not have the same immediate supervisor.

The district court applied an overly restrictive definition of "similarly situated" under the facts of this case. In *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992), on

which the district court relied, this court held that "to be deemed 'similarly-situated[,]' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Subsequent cases, however, make clear that the *Mitchell* factors were never meant to be rigid requirements. For example, in *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998), we explained:

> Courts should not assume, however, that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated; rather, ... the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects.

*Id.* at 352 (internal quotation marks omitted); *see also Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012) ("[W]e have never read 'the "same supervisor" criterium' [sic] as an 'inflexible requirement.' " (quoting *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 479–80 (6th Cir. 2003)); *Gibson v. Shelly Co.*, 314 F. App'x 760, 771 (6th Cir. 2008) ("[W]e have never held that an equivalence of supervisors was *required* to establish similarity."). Here, Henry presented evidence showing that, regardless of which manager a CRI reported to, all CRIs had the same job duties and were governed by the same policies and procedures, and that Boogaard (Marvin, Matovich, and Williams's supervisor) had the option to add to or remove from consideration CRIs that managers had identified to take pre-assessment surveys. Thus, because there is evidence that Boogaard had the final say regarding eligibility for CRII training and that all teams performed the same role, the district court's reliance on the same-supervisor requirement was inappropriate in this case. *See Gibson*, 314 F. App'x at 771 (finding same-supervisor requirement inappropriate where supervisor had to consult separate committee to terminate employee).

**\*6** Rachel Wallis, a Caucasian female supervised by Matovich, was hired in July 2009 and was promoted to CRII in February 2010, less than a year after she was hired and only several months after she began writing letters to consumers. Like Henry, Wallis's overall rating on her annual performance review in February 2010—although less than a year—was an AE. Henry received one fewer EE rating and one additional PA rating, but several of Henry's objective statistics were better than Wallis's. With similar performance and Henry's extensive experience, Henry's evidence that Wallis was similarly situated and treated more favorably is sufficient to survive summary judgment.

Abbott also argues that there were no similarly situated employees and that Henry was unqualified because Henry had performance issues in 2010, citing the multiple trainings on SalesForce, the disclosure of internal-database credentials, and a PA rating for 2010. This argument is unavailing because all of these issues occurred after Abbott failed to identify Henry as a candidate for promotion in February 2010.

Accordingly, Henry made out a prima facie case for 2009 and 2010 and could establish an inference of discrimination based on the evidence presented.

2. Legitimate, Non-Discriminatory Reason and Pretext

Abbott relies on Marvin's testimony and documentary evidence as support for the legitimate, non-discriminatory reason for declining to identify Henry for promotion that Henry's performance as a CRI demonstrated that she was not qualified to act as a CRII. Henry apparently accepts that Abbott met its burden to proffer a legitimate, non-discriminatory reason, but challenges Abbott's reason as pretextual.

Henry argued before the district court that Marvin's proffered reasons contradicted Marvin's consistently positive performance reviews of Henry; that Marvin mocked Henry's mispronunciation of words;[4] that no African-American employees were promoted to CRII between 2002 and 2011; and that Henry was held to a different standard because she was required to do more than achieve an AE on her performance evaluations. The district court found that Henry could not establish pretext for either year. It found persuasive Abbott's argument that CRI and CRII duties differed so that even if an employee

adequately functions in a CRI role, it does not necessarily mean she will be able to function as a CRII. Moreover, the district court reasoned that there was no evidence that race influenced Abbott's decision because Marvin never used racial slurs or made negative comments about African-Americans. It also noted that, for 2010, Marvin's email discussing why Henry was not promoted, which included criticisms not contained in Henry's performance evaluations, was not evidence of pretext because it was discussing a different job at a different time.

Although the district court is correct that there is no evidence of racial slurs or negative comments about African-Americans, such evidence is not required to show pretext. Here, Henry presented evidence from which a reasonable jury could find that Marvin's proffered reasons for not identifying Henry for pre-assessment surveys are pretextual by comparing her purported reasons for non-promotion with Henry's previous performance evaluations, as well as the performance evaluations of others who were promoted. In particular, Henry's 2007 review noted that Henry is a "quiet superstar who week after week takes a tremendous number of calls and treats each caller with sincere empathy and exceptional customer service." (PID 1235.) Likewise, Henry's performance evaluations for 2008 and 2009 suggest she was doing very well in her role and was certainly a "fully functioning" CRI as that term is defined by management. There is also evidence that the requirements to be identified for consideration for promotion consisted solely of having an undergraduate degree and working as a CRI for one year with an AE on the annual performance evaluation. Henry undisputedly met these criteria, yet Marvin did not identify her for promotion based on other criteria.

*7 As an example of how routine it was to be trained for a CRII promotion, Matovich could only name one CRI who had not been promoted to CRII—an employee who Matovich demoted from CRII because she was struggling in the role, who declined to pursue a CRII opportunity after that. And Marvin could not identify any CRI on her team from 2001-2011 who went through CRII training and was not promoted. Moreover, as discussed above, some employees were promoted to CRII without serving a full-year as a CRI, and some were hired directly into the CRII position. Those who were promoted and whose performance evaluations are in the record have performance evaluations that were not markedly superior to Henry's, and Henry had much more experience in the CRI role. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) ("Under this Court's decisions, qualifications evidence may suffice, at least in some circumstances, to show pretext.").

For these reasons, a jury could disbelieve Abbott's proffered reasons for non-promotion. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 394 (6th Cir. 2008) (finding that evidence of the plaintiff's superior qualifications for the position create a genuine dispute of fact regarding pretext despite evidence that the other candidate had more managerial experience, and discounting the employer's explanation that the plaintiff interviewed poorly because "the very issue in dispute is whether the reasons given by these interviewers for their decision should be believed, [and thus] it would be highly inappropriate for us to assume ... that their own subjective perceptions of [the plaintiff] were accurate").

Accordingly, Henry presented a genuine dispute of material fact regarding pretext.

### 3. Judicial Estoppel

Abbott also argues that Henry's race-discrimination claims are barred by judicial estoppel because Henry failed to list these claims on her Chapter 7 bankruptcy petition. Henry filed for Chapter 7 bankruptcy on November 28, 2008, and received a discharge on April 21, 2009.

Judicial estoppel is an equitable doctrine that "should be applied with caution to 'avoid impinging on the truth-seeking function of the court, because the doctrine precludes a contradictory position without examining the truth of either statement.' " *Eubanks v. CBSK Fin. Grp., Inc.*, 385 F.3d 894, 897 (6th Cir. 2004) (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir.1990)).

> [T]o support a finding of judicial estoppel, we must find that: (1) [the plaintiff] assumed a position that was contrary to the one that she asserted under oath in the bankruptcy proceedings; (2) the bankruptcy court adopted the contrary position either as a preliminary matter or as part of a final disposition; and (3) [the plainitff's] omission did not result from mistake or inadvertence.

*White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 478 (6th Cir. 2010).

The filing of a bankruptcy petition creates a bankruptcy estate. 11 U.S.C. § 541(a). "This estate comprises property, broadly defined to include 'all legal or equitable interests of the debtor in property *as of the commencement of the case.*' Under this rule, '[p]re-petition causes of action are part of the bankruptcy estate and post-petition causes of action are not.' " *Cook v. Baca*, 512 F. App'x 810, 819 (10th Cir. 2013) (internal citation omitted) (quoting 11 U.S.C. § 541(a); *Witko v. Menotte (In re Witko)*, 374 F.3d 1040, 1042 (11th Cir.2004)); *see also Tyler v. DH Capital Mgmt., Inc.*, 736 F.3d 455, 464 (6th Cir. 2013) (explaining that there must be "a pre-petition violation" for a cause of action to be part of the bankruptcy estate). Because Henry filed her bankruptcy petition in November 2008 and seeks monetary damages for Abbott failing to promote her in 2009 and 2010, the alleged actionable discrimination occurred after she filed her bankruptcy petition. Therefore, she never asserted a contrary position in her bankruptcy petition, and there is no judicial estoppel. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' ").

**B. Retaliation**

 ***8**  To establish a prima facie case of retaliation under Ohio law, "a claimant must prove that (1) she engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007). "If a complainant establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate, non[-retaliatory] reason for its actions. If the employer satisfies this burden, the burden shifts back to the complainant to demonstrate that the proffered reason was not the true reason for the employment decision." *Id.* (internal quotation marks and citations omitted).

The district court held that Henry failed to establish a materially adverse action, and Abbott further argues that Henry cannot show causation or pretext. Thus, there is no dispute about whether Henry engaged in a protected activity and whether Abbott was aware that Henry engaged in that activity.

1. Adverse Action

"To establish an adverse employment action under the third prong, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Garner v. Cuyahoga Cty. Juvenile Court*, 554 F.3d 624, 639 (6th Cir. 2009) (quoting *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006)). This court has held that even where one employment action may not rise to the level of an adverse action, "multiple incidents taken together might dissuade a reasonable worker from making or supporting a discrimination charge." *Spence v. Donahoe*, 515 F. App'x 561, 572 (6th Cir. 2013) (internal quotation marks omitted) (quoting *Sanford v. Main St. Baptist Church Manor, Inc.*, 327 F. App'x 587, 599 (6th Cir .2009)).

The district court cited the appropriate standard from *Burlington Northern* but then cited only cases preceding *Burlington Northern* to support its conclusion that Henry did not establish a materially adverse action. Post-*Burlington Northern*, this court has recognized that the standard for showing a materially adverse action is not onerous. For example, in *Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584, 596 (6th Cir. 2007), this court found the adverse-action prong met, holding that "[t]he retaliatory actions alleged by Michael, including her brief placement on paid administrative leave and the 90-day performance plan, appear to meet this relatively low bar." *See also Laster v. City of Kalamazoo*, 746 F.3d 714, 732 (6th Cir. 2014) ("Facing heightened scrutiny, receiving frequent reprimands for breaking selectively enforced policies, being disciplined more harshly than similarly situated peers, and [being] forced to attend a pre-determination hearing based on unfounded allegations of wrongdoing might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.").

As Abbott argues, however, some cases post-*Burlington Northern* still hold that a negative employment evaluation does not rise to the level of a materially adverse action if it does not impact an employee's wages or professional advancement. *See, e.g.*, *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 290 (6th Cir. 2012) ("Generally,

a negative employment evaluation does not rise to this level unless it 'significantly impact[s] an employee's wages or professional advancement.' " (quoting *James v. Metro. Gov't of Nashville*, 243 F. App'x 74, 79 (6th Cir. 2007))). But here, it is undisputed that receiving a PA on an annual performance evaluation, as Henry did in 2011, renders an employee ineligible for a promotion and therefore affects her advancement potential. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 348 (6th Cir. 2012); *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 432 (6th Cir. 2007). Henry has also pointed to more than just the low performance evaluation, including increased scrutiny, a letter of expectations threatening further action if her performance did not improve, and being kept on the training line. Under these circumstances, a reasonable jury could find that these actions could dissuade a reasonable worker from making or supporting a charge of discrimination.

2. Causation

**\*9** "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). "Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Heightened scrutiny of an employee's work after she engages in protected activity can also imply causation. *See Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009). Though temporal proximity alone may, in some circumstances, provide a causal inference, this court has generally required the protected activity and adverse action to occur extremely close in time in order to make that inference. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Id.* at 523 (quoting *Nguyen*, 229 F.3d at 563).

As an initial matter, Abbott argues that Henry did not address causation below or in her opening brief and has thus waived any argument in support of causation. Although not specifically delineating a separate causation argument, Henry generally argues that causation is established due to the proximity between the adverse actions and her OCRC charge, as well as identifying evidence where Abbott makes reference to her charge. We find no waiver under these circumstances.

Viewing the evidence in the light most favorable to Henry, she presented a genuine dispute of material fact about whether Abbott took materially adverse actions against her because of her protected activity. The record indicates that Abbott likely learned of Henry's OCRC charge on June 8, 2010. Shortly thereafter, Marvin met with employee relations to discuss Henry's deficiencies and began monitoring Henry more closely. After the meeting, Marvin assigned a quality coordinator to sit with Henry. Moreover, Henry's call-quality scores for June (88.4%), July (93.5%), and August 2010 (93.4%) were significantly lower than Henry had received in the prior few months and fell below a rating of AE. The close proximity of these actions to Henry's protected activity creates an inference of causation. In addition, the low numbers were later cited in Henry's performance evaluation as justification for a PA rating, which eventually was used as justification to provide the letter of expectations. A reasonable jury could thus find that Henry's work was being overly scrutinized to find a reason to discipline her, which implies causation. *See Hamilton*, 556 F.3d at 435-36.

A reasonable jury could also find that the other actions, although occurring later in time, also would not have occurred in the absence of Henry's protected activity. After she returned from her suspension in November 2010, Abbott decided to keep Henry on the training line rather than return her to her normal duties. *See Nguyen*, 229 F.3d at 566–67 ("[P]revious cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months."). Employee relations notes also reflect that in late-2010 and into 2011 multiple persons were advocating for Henry to receive an NA for her overall performance evaluation, as well as placing Henry on a performance improvement plan. References are made throughout these notes to Henry's OCRC charge. Because the burden at the prima facie case stage is not onerous and all reasonable inferences are to be drawn in Henry's favor, Henry met her burden to establish causation.

### 3. Pretext

Abbott asserts that Henry failed to address pretext in her opening brief and therefore abandoned this argument on appeal. Again, we find that Henry's opening brief preserves her pretext argument, as she argues that Henry's performance did not actually motivate Abbott's challenged conduct.

**\*10** Turning to the merits, Henry had serious performance issues in 2010, including the incident where she supplied internal credentials to a customer that could have resulted in a confidentiality breach, and she admits that her performance was worse in 2010 than in any other year. On the other hand, the increased scrutiny, involving additional sit-withs and a quality coordinator sitting with Henry immediately after Marvin's meeting with employee relations in June 2010, occurred very soon after Abbott learned of OCRC's charge. Henry's call-quality scores then dropped significantly over the next three months.[5] A reasonable jury could infer this was due to Henry's OCRC charge.

Henry also points to evidence of internal discussions between employee relations, HR, and management about her performance. This includes the recommendation from Abbott personnel that Henry receive a lower performance evaluation than was warranted based on her overall performance. It also includes a note in an employee relations file to wait "a reasonable amount of time" before "plac[ing] her on a formal coaching plan." (PID 1865-66.)[6] A reasonable jury could infer that Abbott had a pre-determined plan to discipline Henry regardless of her performance.

Moreover, a jury could infer retaliation and doubt Abbott's proffered reasons for its adverse actions due to the inconsistency between Henry's 2010 performance evaluation (with which Henry disagrees) and her performance evaluations from previous years. Indeed, Henry testified that she received an AE on her performance evaluations from 2003-2009. A reasonable jury could conclude that the stark drop-off in her 2010 evaluation was not the result of her performance alone. This inference is bolstered by Marvin's admission that based on Henry's overall call-quality scores for 2010, she achieved an AE, though Marvin rated her as PA in her performance evaluation.

Because a reasonable jury could infer that Abbott's proffered reasons for its adverse actions were not the real reasons, we reverse the district court's grant of summary judgment in favor of Abbott on Henry's retaliation claim.

**C. Constructive Discharge**

Henry also argues that she was constructively discharged because she was "harassed, humiliated, effectively demoted, and unfairly disciplined" and that Abbott's "clear design was to force [Henry] out the door." (Appellant Br. 39, 40.) "To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Laster*, 746 F.3d at 727-28.[7]

**\*11** Although Henry provided enough evidence to establish a materially adverse action for her retaliation claim, she has not met the burden necessary to show a constructive discharge. *See Laster*, 746 F.3d at 719 (explaining that "[t]he fact that Plaintiff cannot show that he was constructively discharged is not dispositive of Plaintiff's Title VII retaliation claim where Plaintiff has provided evidence of other adverse actions which raise a genuine issue of fact as to whether or not they satisfy this standard"). In her appellate briefing, Henry relies on her low performance evaluation and the letter of expectations, which are insufficient to establish a constructive discharge. *See Smith v. Henderson*, 376 F.3d 529, 534 (6th Cir. 2004) ("The above-described actions involve the manner in which the USPS supervised and/or criticized Smith's job performance and assigned job duties to her, actions which normally are insufficient to establish a constructive discharge as a matter of law."); *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) ("[W]e have held that criticism in performance reviews and institution of performance improvement plans, alone, do not constitute objectively intolerable conditions."). Although Henry believed that the letter of expectations was intended to force her to quit, Henry's subjective beliefs do not carry her burden. *See Agnew*, 286 F.3d at 310 ("Agnew was not demoted. He enjoyed the same job with the same benefits until the day he quit. He took a leave of absence on his third day of the first Performance Plan, used the leave time to get a different job, and then quit for good the day he reported back for duty. An employee

who quits a job in apprehension that conditions may deteriorate later is not constructively discharged.").

The only case Henry cites in the constructive-discharge section of her brief, *Hurtt v. International Services, Inc.*, does not remotely resemble her case. 627 F. App'x 414, 420-21 (6th Cir. 2015) (finding constructive discharge where the employer terminated the plaintiff's $70,000 draw and prepaid expenses, and placed him on commission resulting in indebtedness to employer of over $22,000). Accordingly, the district court correctly concluded that Henry failed to establish a constructive discharge.

## III.

For these reasons, we **REVERSE and REMAND** Henry's claims of race discrimination and retaliation for proceedings consistent with this opinion, but we **AFFIRM** the district court's determination that Henry has not established a constructive discharge. We also **DENY** Henry's motion to take judicial notice.

**All Citations**

--- Fed.Appx. ----, 2016 WL 3209498, 129 Fair Empl.Prac.Cas. (BNA) 317

---

Footnotes

\*  The Honorable Avern Cohn, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

1  Surveys were not always completed prior to designating a CRI for CRII training. For example, Tiffany Walker Graham, a Caucasian, was designated for CRII training prior to completing the pre-assessment process.

2  The record is not clear as to when these surveys were distributed. The surveys are generally distributed twice per year to CRIs that managers had identified for possible promotion, although they were not always distributed at the same time each year. Some testimony indicates that Marvin distributed the pre-assessment surveys after Henry initially complained in March 2010. Other documentary evidence suggests that the surveys were not distributed until no earlier than April 2010. Either way, the surveys were distributed outside of the normal timeframe, causing the representatives conducting the surveys to question the timing.

3  Henry filed a motion requesting that this court take judicial notice of two exhibits to Peter Youngs's deposition consisting of Abbott's employer-information reports, and deposition testimony about those exhibits. This evidence was not filed in the district court. Henry is offering this evidence to show the number of African-Americans employed in an administrative support role such as Henry's during 2009 and 2010 in the Columbus, Ohio facility. Henry's motion is denied as an improper attempt to supplement the record on appeal with materials that are subject to reasonable dispute and are being offered for the substantive facts within the documents. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466-67 (6th Cir. 2014); *Sigler v. American Honda Motor Co.*, 532 F.3d 469, 477-78 (6th Cir. 2008).

4  For example, there was evidence that Marvin mocked Henry for mispronouncing "ask" as "ax" or "act." (Henry Dep., PID 567-68.)

5  This drop coincided with Abbott's implementation of SalesForce, which Henry admittedly struggled with, but there is evidence that others struggled with SalesForce as well, and that there were issues with the system itself. Although a reasonable jury may conclude that Henry's struggles with SalesForce justified the lower call-quality scores, a reasonable jury could also conclude that Henry's call-quality scores dropped because of her OCRC charge, and we are required to draw all reasonable inferences in Henry's favor at this stage.

6  Boskovic disputed this inference and testified that Abbott would support Henry's efforts to succeed, and only if she failed to improve would Abbott place her on a formal coaching plan, but the jury could make an alternative inference.

7  The Ohio standard does not appear to consider the employer's intention. *See Mauzy v. Kelly Servs., Inc.*, 664 N.E.2d 1272, 1274 (Ohio 1996). ("The test for determining whether an employee was constructively discharged is whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign.").

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.